**Exhibit E**

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

PEDRO R. DELEON GUERRERO,            ) CIVIL ACTION NO. 04-0033
                                     )
                Plaintiff,           )
                                     )
        v.                           )
                                     )
MASAYUKI ISODA, aka MIKE ISODA,      )
                                     )
                Defendant.           )
_____)


**<u>DEPOSITION OF MASAYUKI ISODA</u>**
**<u>aka MIKE ISODA</u>**


Taken at the Law Offices of Douglas F. Cushnie
2nd Floor, Lim's Building
San Jose, Saipan
Commonwealth of the Northern Mariana Islands

June 21, 2005


=========================
Transcribed by:
Celina A. Concepcion
**dba Judicial Services**
Atuhong Place, Chalan Piao
P. O. Box 500051
Saipan, MP  96950-0051
(670) 235-7585

1        back page?  The last page and tell me whether that

2        appears to be a copy of your signature on that

3        document?

4    A   ...[mumbling], it's my signature.

5        MR. PIERCE: His question -- he's asking you to confirm

6  whether that's your signature.

7    A   Yeah, this is my signature.

8    Q   I'm going to show you another document, which is

9        entitled Ground Lease, and I would like you to take a

10       look at that document as well.  And, on about the

11       second to the last page, I'd like you to take a look at

12       the signatures there and tell me whether it appears

13       that your signature or a copy of your signature is on

14       that document?  I'll also provide a copy to your

15       counsel, in case he would like to look at it.

16    A   This is my signature.

17    Q   Now, are you familiar then with ah, what the document,

18       the Settlement Agreement, contains?  Ah, and let me

19       just outline it, in part at least.  It appears that

20       Mr. Guerrero was supposed to pay you some $350,000 and,

21       if he did not do so within a 90-day period, that he was

22       to give you a lease on two pieces of property in

23       Garapan, is this roughly correct?

24    A   Yeah.

25    Q   Okay, in fact, he did not pay you the $350,000, did he?

1    A    Yeah.

2    Q    Okay, and as a result of that, this lease was executed

3         by and between you and Mr. Guerrero, correct?

4    A    ...[inaudible reply].

5    Q    Now, on this Settlement Agreement and lease

6         arrangement, do you under -- what do you understand you

7         were supposed to do with respect to the property, these

8         two lots in Garapan, what do you understand you were

9         required to do, if anything, regarding the lease of the

10        property?  The assignments of the lease?

11        MR. PIERCE:  Objection; the document speaks for itself.

12   You have to answer his question.

13   A    Ah, very hard to understand...[laughing] that's how I

14        will answer it, you know.

15   Q    Okay, if you don't understand what I'm asking you,

16        please....

17   A    Yeah.

18   Q    ....say so, I'll be happy to rephrase it, okay?

19   A    Yeah, yeah.

20   Q    Considering this agreement, the Settlement Agreement

21        and then the Lease, what is your understanding, not

22        necessarily what the law is.  I'm not asking you that.

23        I'm asking you what your understanding is as to--

24   A    My understanding is I get back my land because of this,

25        this is the fundamental one.

-12-

1            MR. CUSHNIE: Okay.

2    A    Then I get the 55 years lease, ground lease I have it.

3         If I cannot make development by myself, if I go

4         sublease it or something?  I gonna provide one third of

5         my income to Mr. Guerrero.  That's what I understand.

6    Q    Okay, so let me rephrase it and you -- you correct me,

7         if I'm wrong here.  Your understanding is that you

8         would have a 55-year lease on these two properties,

9         that you had a right to develop these properties, that

10        if you could not develop these properties, that you

11        could assign the lease document or sublease the

12        properties and, if you did that, Mr. Guerrero was to

13        share one third in the ah....

14    A    Yeah.

15    Q    ....income, is this correct?

16    A    Yeah.

17    Q    Now, have you made any attempts to lease the property

18        or sublease the property?

19    A    Yes.

20    Q    Okay, could you describe for us, please, what efforts

21        you have made to lease the properties?

22    A    Almost every time somebody interesting in, not only the

23        my friend, interesting to develop Saipan, I offer them

24        I have the property in Garapan.

25    Q    Now, can you give us the names of any of these

```
 1              individuals that you might have spoken to with respect
 2              to leasing the property?
 3    A         Yeah, but most it's history already, long time.
 4    Q         Okay, you don't recall the names of any of these
 5              persons or companies?
 6    A         Yeah, most likely -- most likely I can remember is
 7              Mr. Endo (ph.) introduced by the Mr. Sablan, but I
 8              didn't met him yet.
 9    Q         Do you know Mr. Endo's first name?
10    A         Oh, I didn't know.
11    Q         Okay, and which Mr. Sablan is this?
12    A         Ah, Mike Sablan, working in ah, land corporation, MP --
13              MPLA?  M--
14    Q         He's with MPLA now?
15    A         MPLC?  I don't know.
16    Q         You don't know?
17    A         Either one.
18              MR. CUSHNIE:  I understand.
19    A         Land corporation.
20    Q         Okay, do you know his nickname?
21    A         Palaksi.
22    Q         Right, okay.  Can you think of any other individuals
23              who you may have spoken to with respect to a lease of
24              the property?
25    A         Ah, the Korean guy, one of my friend, ah he live in
```

1       Pusan.  Ah, I call his nickname is Ted, Mr. Kim.  I

2       always call Ted now.  He came in Saipan, I think

3       already almost 10 years ago?

4       MR. CUSHNIE:  Huh.

5   A   He was interesting too.

6   Q   Okay, this was about 10 years ago then?

7   A   Yeah, 10, 11 years, I cannot ah, recall, but ah, he

8       came in and stay almost ah -- ah almost one months he

9       stay here to research the business.

10   Q   Ah, any others, other than ah, the gentleman that was

11      referenced by ah, Mr. Sablan and this Ted Kim, do you

12      recall anybody else?

13   A   Yeah, Mr. Sablan said Endo's friend, I forgot his name,

14      ah also Mr. Sablan told me he was interesting.

15      MR. CUSHNIE: Okay.

16   A   Then that's why I said anytime, anytime he came in,

17      that's I gonna meet him, either Guam or Saipan, either

18      way.

19   Q   Anyone else that you can recall?

20   A   No, I can't name it, that ah, you know so many person,

21      but ah, I don't know how they serious or, I don't know,

22      you know.  That's why I can list it up name, maybe 20,

23      30 names, but I don't know, might be them might be just

24      talking to me.  Even I have operating that ah, hotel in

25      Guam, that time our hotel is membership hotel, the

1         mostly the customer is membership, so those VIP came

2         in?  They gonna ask the dinner time or something?  Oh,

3         Mr. Isoda, what's the business is most like in Saipan?

4         Okay, I have Garapan property.  Many times talk.

5    Q    But you don't recall the names of any of these

6         individuals at the present time?

7    A    I can call it, even that, ah you know, around ah, four,

8         five months ago I talk to Japanese guy.

9    Q    Do you recall his name?

10   A    Ah, I don't want.  This is the one that right now I'm

11        negotiating the project in here.

12        MR. PIERCE:  Well, you have to give the name, Mr.

13   A    Ah, no...[laughing], he's very popular guy in Japan, so

14        I don't want.  His corporation is very popular too.

15        Because...[unintelligible] you know, somebody business,

16        okay, very good.  How many times I lost my project

17        because of that, ah I'm talking too...[chuckle], that's

18        why I don't wanna, but this is, right now, I'm

19        negotiating.  But in -- including that ah, Garapan

20        land, but he's not the interesting not only the small

21        space, he's talking little bit big operation.

22        MR. CUSHNIE:  Well, I'd really like to get the name of

23   this individual, Mr. Isoda, ah I'll be happy to, for our

24   purposes at the present time, if it'll make you feel

25   comfortable, ah to ensure that this deposition is not

-16-

1    broadcast to the public because I certainly don't want to

2    interfere with your business opportunities, but ah, I'm sure

3    you understand that we would like to find out right now,

4    rather than find out six months from now in the middle of a

5    trial, so I would appreciate it if you could provide that

6    information and I'll certainly assure your counsel that ah,

7    this transcript is not going anywhere but between us at the

8    present time.

9        MR. PIERCE: You have to, you have to give him the name,

10   Mr. Isoda.

11   A    Can I request to stop that ah, recording?  Is that all

12        right?

13       MR. PIERCE: Sure.  He wants us to go off--

14       MR. CUSHNIE: We will go off the record for just a few

15   moments.

16   OFF/ON RECORD

17       MR. PIERCE:  So, we're gonna have the informal

18   confidentiality agreement.

19       MR. CUSHNIE: Okay--

20       MR. PIERCE:  Not disclose, except in the context of

21   this litigation.

22       MR. CUSHNIE:  Right, we're back on the record and ah,

23   Mr. Isoda has had an opportunity to speak with his counsel

24   and the ah, information with respect to the name of the

25   business investor that Mr. Isoda will be dealing with ah, is

-17-

1    subject to at least an informal confidentiality agreement

2    between the parties so that the -- the name will not be

3    divulge, except ah, within the context of this litigation,

4    is that satisfactory?

5        MR. PIERCE: Yeah, it's fine.  Go ahead, tell him the

6    name.

7    A    Ah, two person.  One old one is Mr. Ozeki (ph.) and

8        another guy is Takano (ph.).

9    Q    Do you have the first name of Mr. Ozeki?

10   A    Ah, Ken-chang (ph.).  I think Kenji, Kenji Ozeki or

11       Kenichi (ph.), I forgot.  I call that Ken-san, Ken-san

12       also.

13   Q    Kenji or Kenichi, one or the other?

14   A    Yeah, yeah, but ah, I call him the Ken-san.

15   Q    Ken-san?

16   A    Yeah, most likely Japanese say Mr. Ozeki, so if little

17       bit close conversation?  I said Ken-san.

18   Q    Okay, how about Mr. Takano?

19   A    Ah, Takano is ah, Toro.

20   Q    Toro?

21   A    Yeah, Toro.

22   Q    Are both of these individuals ah, involved in the same

23       business project?

24   A    Ah, yes.  Yes.

25   Q    Are either of these individuals ah, involved in with

1          respect to any proposed development of these two lots

2          in Garapan?

3     A    I wish.

4     Q    Which means no?

5     A    Ah because I proposed to him already....

6     Q    Uh-huh?

7     A    ....but ah, their concern is little bit more big

8          operation, so if staff house, whatever they needed,

9          they -- they might be count in their project.

10    Q    Do either of these gentlemen ah, have a company or a

11         corporation that they do business under that you would

12         be dealing with?

13    A    Yeah, these -- these individual, the person, have the

14         individual company, different separate company.

15         MR. CUSHNIE: Separate companies.

16    A    But ah, business category is same, so they wanna make

17         ah, kind of the consortium associate, you know.

18    Q    And, this is the development with respect to

19         construction of dormitories?

20    A    Kind of, dormitory of a school.

21    Q    It would be for students then?  Is this correct?

22    A    Yeah, student status, yes.

23    Q    It's not a retirement home or?

24    A    No, no, no, no.  More younger.

25    Q    Other than the ah, persons that we've discussed so far,

1         can you recall any other individuals that you have

2         dealt with, with respect to the development ah, leasing

3         of the property, or assignment of the lease regarding

4         these two lots?

5   A   Ah, the co -- corporation name is SE, Inc., or (?),

6         Inc.?  I forgot.  Ah Togawa, Mr. Togawa.

7   Q   When did you speak with Mr. Togawa?

8   A   Last time?

9         MR. CUSHNIE: Yes.

10  A   Ah, I think 10 days ago.

11  Q   What was the substance of this conversation, that is,

12        what did you say, basically, what did he say, if

13        anything?

14  A   He likes to -- he likes to sublease or assign lease or

15        -- yeah, yeah.

16  Q   Was any sort of dollar amount discussed?

17  A   Yeah, he -- he said 120,000.

18  Q   Is that the same offer that your attorney communicated

19        to -- to Mr. Guerrero, through me?

20  A   Yeah.

21  Q   The same offer?

22  A   Yeah.  The one -- that ah, paper?  The writing?  By

23        counsel?

24        MR. PIERCE:  The letter, yes.

25  A   Yeah, yes, same thing.

1   Q   Is that ah, an acceptable figure to you?  Or not.

2   A   All depend...[laughing].

3   Q   And, what -- what does it--

4   A   Because -- because even -- even I say so, but ah, I

5       think that Mr. Guerrero have that ah -- ah first

6       refusal right or something?  I don't know.

7   Q   Okay, but putting Mr. Guerrero aside, not worrying

8       about him at the moment, ah is -- is that kind of a

9       dollar figure acceptable to you?

10  A   Yeah, I believe so.

11  Q   Anybody else, other than the people you've already

12      mentioned, that you've spoken to with respect to ah,

13      leasing the property or assigning the lease, developing

14      the property?

15  A   Ah based on that ah, I -- I was talking to this ah, 10,

16      12 years, ah most likely joint venture, meaning say the

17      start new corporation, to assign that ah, property to

18      new corporation to start.  So, that's what I answer to

19      you, you asked me the lease or assign or something?

20  Q   However, have you spoken to any other individuals or

21      the representatives of any other companies, other than

22      the ones we've discussed, regarding the lease of the

23      property or assignment of the lease?

24  A   My answer is yes.

25  Q   Okay, could you provide us the names then, sir?

-21-

1    A    Maybe I misunderstand, I cannot understand, I just

2         explain already the situation, Korean guy, everything.

3    Q    Okay, no, I--

4    A    Those guys also talking to that ah, sublease also.

5    Q    I understand that, and--

6         MR. PIERCE:  He's talking about more names, Mr. Isoda,

7    do you remember any more names.

8         MR. CUSHNIE:  Any other people that you've spoken to

9    with respect to this.  I understand the ones we already

10   have.

11   A    Yeah, the Yamamoto, Mr. Hiraga too.  JJ Kim.  Yamanaka.

12        Ishii.  Those, all the name is coming out long time,

13        but--

14   Q    Mr. Hiraga, who is that, sir?

15   A    Hiraga is ah -- ah he's one of the building maintenance

16        company owner.  He often came to Guam.  So,

17        coincidence, I know him through his relative in Guam,

18        his name is Yamamoto, so he was interesting in the

19        Saipan, so I talked to him that property also.  That's

20        already, oh 10 years ago.

21   Q    You mentioned a Kim?

22   A    Ah yes, this is Kim is, you know in Korea, Kim is so --

23        million Kims there, you know.

24        MR. CUSHNIE:  Right.

25   A    That one is we call -- I call JJ, JJ Kim.  He help me

-22-

1          the my hotel ah--

2     OFF/ON RECORD - Continued on Side B.

3     Q    Have you ever ah, posted signs on the property ah, like

4          for lease?  For rent?

5     A    No, I didn't.

6     Q    Lately the property has been ah, well, overgrown,

7          people have been throwing trash, garbage, ah other

8          things on the property, ah have you ever during the

9          past, say, 12 years or more, ah had the property

10         cleaned?

11    MR. PIERCE:  Well--

12    A    Yes, ah--

13    MR. PIERCE:  Excuse me.  You have to answer, but I want

14    to object first.  Objection; assumes facts not in evidence,

15    go ahead and answer the question.  Have you ever had the

16    property cleaned.

17    A    Yes, before.

18    Q    Okay, could you tell me when, sir?

19    A    Ah that time, still I'm operating the MTDC, I use my

20         employee to clean the property, even that ah -- ah not

21         to fence it, but to, how do you call?  The wire?  To

22         private property, to sign it.

23    Q    Okay, ah when was the last time you did this, sir?

24    A    I cannot ah, memorize.

25    Q    Well, when did MTDC stop operating, do you recall?

1

2

3

4

5

6

7                                    C E R T I F I C A T E

8          I, **Masayuki Isoda**, do hereby certify and declare under

9    penalty of perjury that I have read the foregoing

10   transcript of my deposition taken on June 21, 2005, and that

11   the questions asked of me and answers given by me are true

12   and correct, [with|without] corrections indicated on the

13   following page(s).

14          Executed at _____SAIPAN_____ this

15   __22 nd__day of __August_____, 2005.

16

17

18          _____

19                     Masayuki  Isoda

20

21

22

23

24

25

                                    -31-

```
           IN THE UNITED STATES DISTRICT COURT
                        FOR THE
                NORTHERN MARIANA ISLANDS


PEDRO R. DELEON GUERRERO,      :      CIVIL ACTION NO.04-0033

          Plaintiff,           :

          vs.                  :

MASAYUKI ISODA, aka            :
MIKE ISODA,                    :

          Defendant.           :
     _____
```

## DEPOSITION OF PEDRO R. DELEON GUERRERO

Taken at the
Law Office of Richard W. Pierce
2nd Floor Alexander Bldg., San Jose
Saipan, Northern Mariana Islands
June 20, 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Transcribed by**:
Marianas Transcription Services
P.O. Box 500633
Saipan, MP 96950
Tel: (670) 288-5470

1      condition that you just described to me is existing in May,

2      2004, existed from the beginning of the lease?

3    A    Well, you know, I was -- I was nu called upon by some

4      government agency and I said that they have to find Mr.

5      Isoda because the property is under Mr. Isoda lease.  And

6      they themselves also were having problems finding Mr.

7      Isoda, the whereabouts of Mr. Isoda.  So as I stated before

8      that it was difficult for me to ah -- because my -- my

9      purpose really is that if Mr. Isoda can -- can be readily

10     available and so forth I have to tell him that, you know, I

11     thought -- I thought, that at one time I met with him and I

12     thought that, you know, the property will be developed when

13     he told me that there were investors that are going to

14     develop the property.  And believe me, I went to the site

15     when he told me and I said to myself, how can nu this

16     property be market nu the way the property presented

17     itself.  And that was the thing I did not discuss

18     abandonment or things like that.  But he did mention that

19     he was trying to develop the property and that was it.  And

20     then the next -- the next meeting that I have was in -- in

21     a bar where, you know, I was surprised that, you know, he

22     just came and pat me and said, hey Mr. Guerrero, I said

23     yeah, I may turn the property over to you, the economy is

24     very bad.

25   Q    Now again, my question is, the condition that you observed

                                    -13-

1    Brothers borrowed money from CDA to purchase ah

2    equipments.  Equipments that were assigned to ah MTDC.

3    They're, you know, manage 100% by Mike Isoda.  So, the

4    Garapan property has nothing to do with that particular

5    section you're referring to.

6  Q   Mr. Isoda paid off this loan?

7  A   Under this agreement, but has nothing to do with the

8    Garapan property.

9  Q   Did he pay off the loan?

10 A   He should.  I don't know whether he paid it off but he

11   should.

12 Q   All rent was paid under the lease agreement which is

13   Exhibit A in the Complaint, is that correct?

14 A   Under the lease--

15   MR. PIERCE:  Lease Agreement.

16 A   Under the—

17   MR. PIERCE:  Ground Lease Agreement, I call it the Ground

18 Lease Agreement?

19 A   Yes.

20 Q   Now, did Mr. Isoda ever--

21   MR. CUSHNIE: Excuse me, I'm gonna interject an objection to

22 that.  It calls for a legal conclusion on the part of--

23 Q   Mr. Guerrero, again look at the Complaint, go to the back

24   of the exhibits.

25 A   What exhibit?

-18-

1    million or at that time may be a million dollars.  But for

2    purpose of expediting and for purpose of reaching an

3    agreement, we both agreed to $350,000.00.  And that cannot

4    be dispute because Mr. Isoda agreed to that and in fact if

5    I'm not mistaken that was offered.

6  Q  You're saying that Mr. Isoda was offered $350,000.00 for

7    that Ground Lease?

8  A  Mr. Isoda, if I'm not mistaken again, because I did not

9    come up with $350,000.00, but the figure was offered.  And

10    the--

11  Q  Offered by whom, sir?

12  A  I don't recall.  I really don't recall. Yeah.

13  Q  All right.  Now, sir, you had the option, I believe, of

14    paying Mr. Isoda $350,000.00 within 90 days of execution of

15    the settlement, is that correct?

16  A  Believe me, have I -- if there was cash in my pocket, ah I

17    would have handed the $350,000.00 immediately over to Mr.

18    Isoda.

19  Q  I understand that, sir, you did your best efforts during

20    that 90 days to find a lessee, right?

21  A  I did everything to -- to get the property back because I

22    have my own nu plans for the property.

23  Q  Did you find -- try to find a lessee for the property

24    during that 90 days period?

25  A  Like I said, I have plans to develop the property myself.

-23-

1    money is generated, you get a third of it, where is that?

2    Is it in there, sir?

3  A  Well, unless my understanding is ah -- is wrong, but this

4    is my understanding on this 33.3 percent.  That's my

5    understanding.  I mean -- I mean, cannot change my

6    understanding.

7  Q  Now, if the fair market value is today if the lease is

8    $125,000.00, do you agree that the property should be

9    assigned to that?

10 A  You know, you're an attorney and in many cases, you don't

11   later on appraise when the economy is down, you practically

12   good and -- and make reference to at the time of taking.

13   And at that time of taken the appraise value and I will go

14   back to at the time of taken, not at the value today.

15 Q  All I'm asking sir, is if -- if the property can be assign

16   -- the lease can be assigned today for the sum of

17   $125,000.00, will you agree with that?

18 A  No, it's ah nu -- I will not agree to that.

19 Q  Okay.  All right, you said that there was an appraisal of

20   the property back in what 1993?

21 A  What I'm saying is that there was for purpose of

22   settlement, for purpose of settlement, there was a mutual

23   agreement between Mike and I and for purpose of settlement;

24   we agreed to a $350,000.00.  Most probably had we hired an

25   appraiser, the property would have gone up to may be half a

-22-

1    can enjoy whatever revenue comes in because the property is

2    well polished.  Paragraph 4 is what requires him to do

3    that.

4  Q  I'm gonna mark this Exhibit 2.  Please look through it.

5    These are your responses to the Interrogatories given to

6    you.  I'm gonna give a copy to your counsel also.  Is that

7    to be your -- the answers you gave to Mr. Isoda?

8  A  That's correct.

9    MR. PIERCE:  Page 4 to the Exhibit 2.

10  A  This one?

11  Q  Yes.  Is that your signature?

12  A  This is my signature.

13  Q  Yes, sir, okay.  Now, if you turn back to page 1 of Exhibit

14    2, identify for me who Roman Matsumoto?

15  A  Roman Matsumoto is the brother of Juan Matsumoto.  You know

16    John Matsumoto?

17    MR. PIERCE:  I've heard of him.

18  A  All right.

19  Q  Use to have the theatre down at….

20  A  That is correct.

21  Q  ….Chalan Kanoa, right?

22  A  That is correct.  He's married to a Manglona, I think the

23    daughter of Benjamin Manglona.  He use to -- his house is

24    next to Garapan School, ah just the neighbor.  It's the

25    house of former Justice Jesse Borja in Garapan.  He's a

1    self-employed business person, he used to engage in retail

2    and now I he hear he has rent out, but he is also a real

3    estate broker who looks for property for his clients.

4  Q  So what does he know about this property?

5  A  I don't know what he knows about this property.  All I know

6    is that he has been calling me asking whether this property

7    is, you know, for -- available for lease.

8  Q  And did he mention any prices to you?

9  A  If I recall, he mentioned $700,000.00.

10 Q  And when was that, sir?

11 A  2000 and 2003 that he is making call, you know, within that

12   period.

13 Q  Okay.

14 A  2000, 2003.

15 Q  Did he say for whom?

16 A  Ah Japanese investors.

17 Q  And did he say what purposes?

18 A  Ah no.  Ah I think he was representing Japanese investors

19   and Korean investors, ah if I recall.

20 Q  And, did Mr. Matsumoto he called you on the telephone and

21   spoke with you?

22 A  Yes.

23 Q  And how many calls did he make to you?

24 A  I think Matsumoto personally -- I personally talked to

25   Matsumoto about two or three times and my wife has been

1         receiving call from Matsumoto.

2    Q    And, you talked to him on the telephone two or three times?

3    A    I think so.

4    Q    And, Mr. Guerrero I apologize, I don't know your wife. I

5         probably met her a long time ago, but I don't remember.

6         She's a -- she's a business, a real estate person?

7    A    No, she's a housewife.

8    Q    Housewife?

9    A    Yeah.

10   Q    And so she was just getting call and messages for you?

11   A    Receive calls and yeah.

12   Q    And, you spoke with -- did you refer Mr. Matsumoto to Mr.

13        Isoda?

14   A    No, I did not.  Yeah.

15   Q    Why is that, sir?

16   A    Well, the every real estate person, you know, if they're

17        interested in the property they -- they can look into the

18        records, the records is very clear at court that the

19        property is leased to Mr. Isoda.  I did mention it to him

20        that the property is, you know on lease.

21   Q    If you would get a third of whatever Mr. Isoda could assign

22        the lease for, why would you refer Mr. Matsumoto to him?

23        To Isoda?

24   A    Well, if you know, I mean, I've deal with many of these

25        people and they are inquiring and I believe that if --

-28-

1  because Mr. Matsumoto is saying that when this group of

2  people comes over that he's gonna call me and will meet.

3  Now, I cannot transact.  I'm just waiting for the time when

4  these people comes in and that's when I'm gonna have to

5  call Mr. Isoda because I cannot transact this.  Mr. Isoda

6  is the one who's going to transact it.  I will have to

7  concur with it.

8  Q  And, to your know, did these investors ever come?

9  A  Ah I don't think that they ever come because Mr., you know,

10    Matsumoto stop calling me.

11 Q  Who is Man-Soo Song?

12 A  Mr. Man-Soo Song is also known as ah Phillip Song.  I know

13    him as Phillip Song that he's the business, Korean business

14    owner just across two story building where there's a fun

15    and games and there's Japanese restaurant and a night club,

16    that's it.

17 Q  Oh, Kimchee Cabana?

18 A  Yeah, the Kimchee Cabana.

19 Q  It used to be down here in San Jose?  Oleai?

20 A  Well, you know I – maybe.  I -- I don't know, I don't

21    frequent those place.

22 Q  All right.  Well, and what did Mr. Man-Soo Song know about

23    the premises?

24 A  Well, if you look into the second page, it's mentioned on

25    second page that's what he knows about the premise.

1    Q    All right.  Ms. Kileleman, where is she located?

2    A    Ah just next door.

3    Q    That's her house?

4    A    This is -- this is ah -- this property and next door.

5    Q    She lives there, right?

6    A    She lives there.

7    Q    How long she live there?

8    A    Oh, from the time they acquired that, maybe 30 years, 40

9         years, I don't know.

10   Q    Long time she's there?

11   A    Yeah, she's -- …[unintelligible] of the place.

12   Q    And, you spoke with her?

13   A    Well, she's a cousin of mine and so forth and, you know, in

14        several occasion I visit her and she will complained, I say

15        I'm sorry I cannot go in.  It's under lease.

16   Q    Is she still using it for what chicken coup?

17   A    Is she's still using it for what?

18   Q    Chicken coup?

19   A    I don't know whether she's using it for that.  I'm surprise

20        you know better than I do.

21   Q    Now, did Mr. Benny Pangelinan contact you or did you

22        contact him?

23   A    No, he contact me.

24   Q    And did you refer him to Mr. Isoda?

25   A    They -- this people you know, they -- they look at records

1    that they -- oh, of course, I -- I did mentioned I don't

2    know whether him or some of his staffers that you know

3    Isoda live, my understanding that Isoda live around that

4    area that they -- they should contact Isoda.  In fact, I --

5    I nu -- was told when I was interested in trying to find

6    out where Isoda live.  I was told that Isoda was just

7    staying across there were some apartment there.  And I

8    said, my understanding that you can find Isoda there.  Why

9    don't you go and look for him?  And that's what I did.  But

10   unfortunately, I cannot find him.

11 Q   And did Mr. Joaquin Salas of CRM contact you or you contact

12   Mr. Salas?

13 A   No, he contacted me.  There was, I believe Mr. Song wrote

14   him a letter and ah cc copy nu, because Mr. Song was

15   complaining about the property, I said you wrote a letter

16   to CRM because, you know, CRM should initial that.  I

17   cannot do anything about it.  I have a copy of the letter

18   and....

19                 END OF SIDE A/CONTINUE SIDE B

20       MR. PIERCE:  All right, we're back on the record, this is

21   side B of tape 1 in the deposition of Pedro R. Deleon Guerrero.

22   Same people are here who were here previously and Mr. Guerrero

23   I was just asking you ...[unintelligible] Mr. Roman B. Matsumoto,

24   is any other individual ever come to you say within the last

25   ten years and say that they wanted to lease that property?

1  A  Well, Mr. Man-Soo Song, you know, was inquiring, you know,

2     I don't whether for himself but he did mention that there

3     are other group that are looking at the property and maybe

4     interested.  Ah, Mr. Duk Su Bae a Korean guy, you know,

5     been coming over and look at the place and ah say that you

6     know they maybe interest, Korean is interested and that the

7     property is very suitable for commercial development or

8     small size hotel (?).  He's now residing in (?) I believe.

9  Q  Man-Soo Song or Duk Su Bae?

10 A  Duk Su Bae.

11 Q  He's in LA?

12 A  He's in LA, Duk Su Bae.  The last time I know he was in LA

13    was about five -- five years ago.

14 Q  I just wanted to -- who mention these investors Man-Soo

15    Song or Duk Su Bae?

16 A  Duk Su Bae mentioned that and also Man-Soo Song.

17 Q  Now you tell me who Man-Soo Song is.  He owns the

18    business….

19 A  That is correct.

20 Q  ….across the road?

21 A  That is correct.

22 Q  But who is Duk Su Bae?

23 A  He's a Korean businessperson ah engaged in a lot of things,

24    in real estate, in many other things, you know, and he

25    comes in and he goes out, he comes in, he used to live in

1    Guam and like -- like I said the last time I heard of him

2    was that he was in -- ah in fact one of his troupe from Los

3    Angeles, I don't recall his name but he brought with him,

4    he said that the guy, again by the name I thin k Mr. Song

5    something like that, a Korean businessman who have lived in

6    the United States for over 30 years that is also interested

7    in the property.

8  Q   Anything comes of that interest?

9  A   No.  I think they were all affected by the -- the

10     valuations of their, you know, currencies.

11 Q   So you're going back that was 1998, correct?

12 A   Well, my -- with Mr. Bae it's ah Mr. Bae ah 2000 and yeah,

13     1998, yeah.

14 Q   Did Duk Su Bae have a business on Saipan?

15 A   No, he -- he does not have a business.  He was trying to be

16     a part of a group of Korean …[unintelligible].

17 Q   Does he have a house here, do you know?

18 A   No, he comes in as a tourist, you know, and when he comes

19     in as a tourist he stayed in one of the hotels.

20 Q   As far as you know Mr. Man-Soo Song is still here on

21     Saipan?

22 A   Yeah, he's readily here.  Reachable by phone.

23 Q   Okay.  And he still runs the same business up in Garapan?

24 A   I think so.

25 Q   And, the same thing to Roman B. Matsumoto, do you know if

1       he's still here?

2   A   Ah I met Matsumoto, it's about six months ago.  Yeah, that

3       was the last time I met Matsumoto, but I understand that he

4       may be staying in Los Angeles but he move back and forth.

5       He goes there and he comes here and he goes there and comes

6       here.  In the Mainland I don't know where, not Los Angeles

7       but some where in the Mainland.

8   Q   You referred either Man-Soo Song or Duk Su Bae or any other

9       person who talks about investment have you referred them to

10      Mr. Isoda?

11  A   I -- I did mentioned Isoda's name, but they understand this

12      is under -- this is under a lease agreement.  I cannot do

13      anything about it, yeah.

14  Q   Did you contact Mr. Isoda when any of these people who are

15      interested--

16  A   I -- I -- I will, I will contact Mr. Isoda if these people

17      call my attention to really sit and negotiate firmly with

18      their interest.

19  Q   So no one ever came to you with firm offer?

20  A   Most of them are inquiries.

21  Q   Inquiring as to the price?

22  A   No, nu most of them are just, is it for lease?

23  Q   Well, I mean the lease price?

24  A   Only Mr. Roman offered a price.

25  Q   And on Mr. Roman you're waiting for the Japanese investors

-34-

1      to come?

2  A    Yeah, he said that as soon as the Japanese investors comes

3      over he's gonna call me up.  And you know, let me qualify

4      myself because ah he's making reference to other so it's

5      not Japanese investors that he's reference to, so I don't

6      know which investors he's waiting.  But you know, he's

7      representing investors.

8      MR. PIERCE:  I don't have any more questions, maybe your

9  counsel has?  It's up to him.

10      MR. CUSHNIE:  Not at this point.

11      MR. PIERCE:  Okay, well that concludes the deposition.

12      MR. CUSHNIE:  Okay.

13      MR. PIERCE:  Thank you very much for your time.

14      MR. DELEON GUERRERO:  You're very welcome and I--

15      MR. PIERCE:  The way this works Mr. Guerrero, is that I

16  send this tape out, I'm gonna send it to probably Annie

17  Camacho, she's got a little transcription service with the

18  Exhibits and she will, as you know, she'll type it up, put it

19  into little booklet with exhibits attached, the original will

20  be available to Mr. Cushnie and that you'll have 30 days to

21  review it and make corrections if you think that you misspoke

22  or whatever which can be noted on the record later and then

23  after 30 days it becomes final and if you make corrections it

24  becomes part of it and it be part of the record in this case,

25  okay?

```
 1  SAIPAN, COMMONWEALTH OF THE     :
    NORTHERN MARIANA ISLANDS        :     C E R T I F I C A T I O N
 2

 3        I, Anna T. Camacho of Marianas Transcription Services, do
 4  hereby certify:
 5        That the foregoing deposition was taken by tape recording
 6  at the time and place herein set forth and the deponent duly
    sworn;
 7
          That the foregoing pages is a true and correct record of
 8  the testimony of the deponent made at the time of the
 9  examination recorded and transcribed by me to the best of my
    knowledge and ability; if there are any places in the above
10  transcript which are noted as "unintelligible", "(?) or
11  "phonetic (ph)", I was unable to accurately determine that
12  portion of the taped proceedings.
13        That I am not of counsel or attorney for any of the parties
14  in the above entitled matter, nor a relative or employee of such
    attorney or counsel, nor am I financially interested in the
15  outcome of said matter;
16        That the attorney for the defendant will notify the
17  deponent to review and sign the foregoing transcript, the
18  original of which is hereby filed by me with the Law Office of
    Richard W. Pierce, Esq.
19        Dated this _____ day of June, 2005.
20
21
22
23                                    _____
24                                         ANNA T. CAMACHO
25
```

                                    -39-