# ORIGINAL

F I L E D
District Court

OCT 2 7 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

DOUGLAS F. CUSHNIE
P. O. BOX 949
SAIPAN, MP 96950
TELEPHONES: (670) 234/6843 • 234/6830
FAX: (670) 234/9723

Attorney for   **Plaintiff**

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| PEDRO R. DELEON GUERRERO, | ) | CIVIL ACTION NO.  04-0033 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | STATEMENT OF FACTS |
| MASAYUKI ISODA aka | ) | |
| MIKE ISODA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Comes now Pedro R. Deleon Guerrero addressing the statement of
undisputed facts provided by defendant Isoda and presenting further facts in
opposition to defendant's summary judgment motion:

1. The identification of the lease agreement in ¶1 (Def.Ex.A), the
settlement agreement (Def.Ex.B), the letter sent by plaintiff to defendant on May
10, 2004 (Def.Ex.C) and the copy of a letter sent by defendant Isoda to plaintiff
Guerrero on June 7, 2004 (Def.Ex.D) are conceded to be true and correct copies of
the documents referenced.

-1-

2. Defendant's Ex. E is represented to be true copies of portions of deposition transcripts of depositions of defendant Isoda and plaintiff Guerrero and appear to be true copies.

3. Contained in ¶6 is a reference to the settlement agreement (Def.Ex.B) and it is agreed that the two options presented are correct but the designation of the $350,000.00 is incorrect. The agreement provided that that sum was the agreed value of Isoda's interest.

4. The assertion that Isoda tried to market the leasehold title is in dispute. It is further submitted that this assertion in ¶7 is not a fact but a conclusion. The facts are as follows:

a. Defendant Isoda never posted signs on the property that it was for rent or lease. (Isoda depo. T.R. 23/3, Guerrero Aff.@¶6).

b. From the inception of the lease to date the property was neither maintained nor cleared nor kept in a condition presentable to show prospective sublessees or assignees. (Guerrero Aff.@¶5; Guerrero depo.@T.R. 9/11).

c. That during the last several years next preceding the filing of the complaint the property became increasingly overgrown with garbage deposited and the property served as a dump site for construction materials such as sand and aggregate. (Guerrero Aff.@¶7).

d. That at the time the property was leased to defendant Isoda it was

-2-

DOUGLAS F. CUSHNIE, SAIPAN, CM 96950

improved and was available for immediate use. (Guerrero depo.T.R. 14-15).

e. That approximately one year ago a neighbor on the south side of the property constructed and completed a permanent building on the property.

f. That on February 1, 2005 a letter was received by me from Joaquin D. Salas, Director of Coastal Resources advising of the unsanitary condition of the property and that it was subject to violation being issued. (Guerrero Aff.@¶10 & Ex. B).

g. On February 10th a letter was received from Juan Tagabuel, Director of Sanitation advising of unsanitary conditions of the property. (Guerrero Aff.@¶9 & Ex. A).

h. That approximately ten to twelve years ago Isoda spoke to some people regarding the property. There were no contacts subsequent to that date other than the supposed $120,000.00 offer. (Isoda depo. T.R. 15-23).

i. Isoda did not contact any real estate agent to market the property. (Isoda dep. T.R. 15-23).

j. Defendant Isoda did not know if he had an obligation to sublease the property or assign the lease. (Isoda dep. T.R. 27/18).

k. The Garapan lots never earned any money since the lease was entered into. (Isoda T.R. 29/11).

l. The property was never sublet nor the lease assigned.

-3-

DOUGLAS F. CUSHNIE, SAIPAN, CM 96950

5. Defendant Isoda asserts in ¶8 that the parties did not agree or even discuss about hiring an appraiser. It is submitted this is not a material fact and will not be a material fact until such time as a willing and able buyer presents itself.

6. At ¶9 defendant Isoda asserts that Guerrero believes Isoda has fully paid the rent for the two properties. This is not a material fact and it is alternatively an assertion of belief or conclusion of law. The fact is that the lease has not been assigned nor has the property been sublet and thus the full consideration for the lease i.e. marketing it in the form of an assignment or a sublease on the property is part of the unfulfilled consideration for the lease.

7. Defendant Isoda asserts that he is complying with his obligations under the settlement agreement. That is not a statement of fact but is a conclusory allegation which goes to the basic issue of liability in this proceeding.

8. Defendant asserts that he cleaned the lots until MTDC ceased to do business. This is in dispute as there is evidence the properties were never cleaned by Isoda. (Guerrero Aff.¶5, 7; Guerrero depo. T.R. 9-11).

9. Defendant Isoda alleges a conversation with plaintiff Guerrero in a bar regarding turning the property over to Guerrero because the economy is bad. While a fact, it is questionable whether this is a material fact in the context of this pleading.

The facts realleged below are material facts that if believed would entitle

-4-

DOUGLAS F. CUSHNIE, SAIPAN, CM 96950

plaintiff to summary judgment in his favor.

1.  Plaintiff realleges the facts found in ¶4a, thru k, above.

2.  At the time of the settlement it was intended that all relations between the parties be terminated and the cleanest way to do so was by cashing Guerrero and his brother out of MTDC and paying Isoda for his interest in the property. When Guerrero could not raise funds to pay Isoda for his property interest, the fall back position was to lease Isoda the property and he would then promptly and actively market it.

DATED this 27ᵗʰ day of October, 2005.

DOUGLAS F. CUSHNIE
Attorney for Plaintiff

BY _____
DOUGLAS F. CUSHNIE

DOUGLAS F. CUSHNIE, SAIPAN, CM 96950

-5-

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

PEDRO R. DELEON GUERRERO,      ) CIVIL ACTION NO. 04-0033
                               )
               Plaintiff,      )
                               )
        v.                     )
                               )
MASAYUKI ISODA, aka MIKE ISODA,)
                               )
               Defendant.      )
_____)


## DEPOSITION OF MASAYUKI ISODA
## aka MIKE ISODA


Taken at the Law Offices of Douglas F. Cushnie
2nd Floor, Lim's Building
San Jose, Saipan
Commonwealth of the Northern Mariana Islands

June 21, 2005


==========================
Transcribed by:
Celina A. Concepcion
**dba Judicial Services**
Atuhong Place, Chalan Piao
P. O. Box 500051
Saipan, MP  96950-0051
(670) 235-7585

1          the my hotel ah--

2     OFF/ON RECORD - Continued on Side B.

3     Q    Have you ever ah, posted signs on the property ah, like

4          for lease?  For rent?

5     A    No, I didn't.

6     Q    Lately the property has been ah, well, overgrown,

7          people have been throwing trash, garbage, ah other

8          things on the property, ah have you ever during the

9          past, say, 12 years or more, ah had the property

10         cleaned?

11         MR. PIERCE:  Well--

12    A    Yes, ah--

13         MR. PIERCE:  Excuse me.  You have to answer, but I want

14    to object first.  Objection; assumes facts not in evidence,

15    go ahead and answer the question.  Have you ever had the

16    property cleaned.

17    A    Yes, before.

18    Q    Okay, could you tell me when, sir?

19    A    Ah that time, still I'm operating the MTDC, I use my

20         employee to clean the property, even that ah -- ah not

21         to fence it, but to, how do you call?  The wire?  To

22         private property, to sign it.

23    Q    Okay, ah when was the last time you did this, sir?

24    A    I cannot ah, memorize.

25    Q    Well, when did MTDC stop operating, do you recall?

1        Pusan.  Ah, I call his nickname is Ted, Mr. Kim.  I

2        always call Ted now.  He came in Saipan, I think

3        already almost 10 years ago?

4        MR. CUSHNIE:  Huh.

5    A   He was interesting too.

6    Q   Okay, this was about 10 years ago then?

7    A   Yeah, 10, 11 years, I cannot ah, recall, but ah, he

8        came in and stay almost ah -- ah almost one months he

9        stay here to research the business.

10   Q   Ah, any others, other than ah, the gentleman that was

11       referenced by ah, Mr. Sablan and this Ted Kim, do you

12       recall anybody else?

13   A   Yeah, Mr. Sablan said Endo's friend, I forgot his name,

14       ah also Mr. Sablan told me he was interesting.

15       MR. CUSHNIE:  Okay.

16   A   Then that's why I said anytime, anytime he came in,

17       that's I gonna meet him, either Guam or Saipan, either

18       way.

19   Q   Anyone else that you can recall?

20   A   No, I can't name it, that ah, you know so many person,

21       but ah, I don't know how they serious or, I don't know,

22       you know.  That's why I can list it up name, maybe 20,

23       30 names, but I don't know, might be them might be just

24       talking to me.  Even I have operating that ah, hotel in

25       Guam, that time our hotel is membership hotel, the

1        mostly the customer is membership, so those VIP came

2        in?  They gonna ask the dinner time or something?  Oh,

3        Mr. Isoda, what's the business is most like in Saipan?

4        Okay, I have Garapan property.  Many times talk.

5    Q   But you don't recall the names of any of these

6        individuals at the present time?

7    A   I can call it, even that, ah you know, around ah, four,

8        five months ago I talk to Japanese guy.

9    Q   Do you recall his name?

10   A   Ah, I don't want.  This is the one that right now I'm

11       negotiating the project in here.

12       MR. PIERCE:  Well, you have to give the name, Mr.

13   A   Ah, no...[laughing], he's very popular guy in Japan, so

14       I don't want.  His corporation is very popular too.

15       Because...[unintelligible] you know, somebody business,

16       okay, very good.  How many times I lost my project

17       because of that, ah I'm talking too...[chuckle], that's

18       why I don't wanna, but this is, right now, I'm

19       negotiating.  But in -- including that ah, Garapan

20       land, but he's not the interesting not only the small

21       space, he's talking little bit big operation.

22       MR. CUSHNIE:  Well, I'd really like to get the name of

23   this individual, Mr. Isoda, ah I'll be happy to, for our

24   purposes at the present time, if it'll make you feel

25   comfortable, ah to ensure that this deposition is not

1    broadcast to the public because I certainly don't want to

2    interfere with your business opportunities, but ah, I'm sure

3    you understand that we would like to find out right now,

4    rather than find out six months from now in the middle of a

5    trial, so I would appreciate it if you could provide that

6    information and I'll certainly assure your counsel that ah,

7    this transcript is not going anywhere but between us at the

8    present time.

9        MR. PIERCE: You have to, you have to give him the name,

10    Mr. Isoda.

11    A    Can I request to stop that ah, recording?  Is that all

12         right?

13        MR. PIERCE: Sure.  He wants us to go off--

14        MR. CUSHNIE: We will go off the record for just a few

15    moments.

16    OFF/ON RECORD

17        MR. PIERCE:  So, we're gonna have the informal

18    confidentiality agreement.

19        MR. CUSHNIE: Okay--

20        MR. PIERCE:  Not disclose, except in the context of

21    this litigation.

22        MR. CUSHNIE:  Right, we're back on the record and ah,

23    Mr. Isoda has had an opportunity to speak with his counsel

24    and the ah, information with respect to the name of the

25    business investor that Mr. Isoda will be dealing with ah, is

-17-

1    subject to at least an informal confidentiality agreement

2    between the parties so that the -- the name will not be

3    divulge, except ah, within the context of this litigation,

4    is that satisfactory?

5         MR. PIERCE: Yeah, it's fine.  Go ahead, tell him the

6    name.

7    A    Ah, two person.  One old one is Mr. Ozeki (ph.) and

8         another guy is Takano (ph.).

9    Q    Do you have the first name of Mr. Ozeki?

10   A    Ah, Ken-chang (ph.).  I think Kenji, Kenji Ozeki or

11        Kenichi (ph.), I forgot.  I call that Ken-san, Ken-san

12        also.

13   Q    Kenji or Kenichi, one or the other?

14   A    Yeah, yeah, but ah, I call him the Ken-san.

15   Q    Ken-san?

16   A    Yeah, most likely Japanese say Mr. Ozeki, so if little

17        bit close conversation?  I said Ken-san.

18   Q    Okay, how about Mr. Takano?

19   A    Ah, Takano is ah, Toro.

20   Q    Toro?

21   A    Yeah, Toro.

22   Q    Are both of these individuals ah, involved in the same

23        business project?

24   A    Ah, yes.  Yes.

25   Q    Are either of these individuals ah, involved in with

1      respect to any proposed development of these two lots

2      in Garapan?

3    A    I wish.

4    Q    Which means no?

5    A    Ah because I proposed to him already....

6    Q    Uh-huh?

7    A    ....but ah, their concern is little bit more big

8      operation, so if staff house, whatever they needed,

9      they -- they might be count in their project.

10   Q    Do either of these gentlemen ah, have a company or a

11     corporation that they do business under that you would

12     be dealing with?

13   A    Yeah, these -- these individual, the person, have the

14     individual company, different separate company.

15     MR. CUSHNIE: Separate companies.

16   A    But ah, business category is same, so they wanna make

17     ah, kind of the consortium associate, you know.

18   Q    And, this is the development with respect to

19     construction of dormitories?

20   A    Kind of, dormitory of a school.

21   Q    It would be for students then?  Is this correct?

22   A    Yeah, student status, yes.

23   Q    It's not a retirement home or?

24   A    No, no, no, no.  More younger.

25   Q    Other than the ah, persons that we've discussed so far,

1        can you recall any other individuals that you have

2        dealt with, with respect to the development ah, leasing

3        of the property, or assignment of the lease regarding

4        these two lots?

5   A   Ah, the co -- corporation name is SE, Inc., or (?),

6        Inc.?  I forgot.  Ah Togawa, Mr. Togawa.

7   Q   When did you speak with Mr. Togawa?

8   A   Last time?

9        MR. CUSHNIE: Yes.

10  A   Ah, I think 10 days ago.

11  Q   What was the substance of this conversation, that is,

12       what did you say, basically, what did he say, if

13       anything?

14  A   He likes to -- he likes to sublease or assign lease or

15       -- yeah, yeah.

16  Q   Was any sort of dollar amount discussed?

17  A   Yeah, he -- he said 120,000.

18  Q   Is that the same offer that your attorney communicated

19       to -- to Mr. Guerrero, through me?

20  A   Yeah.

21  Q   The same offer?

22  A   Yeah.  The one -- that ah, paper?  The writing?  By

23       counsel?

24       MR. PIERCE:  The letter, yes.

25  A   Yeah, yes, same thing.

1    Q    Is that ah, an acceptable figure to you?  Or not.

2    A    All depend...[laughing].

3    Q    And, what -- what does it--

4    A    Because -- because even -- even I say so, but ah, I

5         think that Mr. Guerrero have that ah -- ah first

6         refusal right or something?  I don't know.

7    Q    Okay, but putting Mr. Guerrero aside, not worrying

8         about him at the moment, ah is -- is that kind of a

9         dollar figure acceptable to you?

10   A    Yeah, I believe so.

11   Q    Anybody else, other than the people you've already

12        mentioned, that you've spoken to with respect to ah,

13        leasing the property or assigning the lease, developing

14        the property?

15   A    Ah based on that ah, I -- I was talking to this ah, 10,

16        12 years, ah most likely joint venture, meaning say the

17        start new corporation, to assign that ah, property to

18        new corporation to start.  So, that's what I answer to

19        you, you asked me the lease or assign or something?

20   Q    However, have you spoken to any other individuals or

21        the representatives of any other companies, other than

22        the ones we've discussed, regarding the lease of the

23        property or assignment of the lease?

24   A    My answer is yes.

25   Q    Okay, could you provide us the names then, sir?

1    A    Maybe I misunderstand, I cannot understand, I just

2         explain already the situation, Korean guy, everything.

3    Q    Okay, no, I--

4    A    Those guys also talking to that ah, sublease also.

5    Q    I understand that, and--

6         MR. PIERCE:  He's talking about more names, Mr. Isoda,

7    do you remember any more names.

8         MR. CUSHNIE:  Any other people that you've spoken to

9    with respect to this.  I understand the ones we already

10   have.

11   A    Yeah, the Yamamoto, Mr. Hiraga too.  JJ Kim.  Yamanaka.

12        Ishii.  Those, all the name is coming out long time,

13        but--

14   Q    Mr. Hiraga, who is that, sir?

15   A    Hiraga is ah -- ah he's one of the building maintenance

16        company owner.  He often came to Guam.  So,

17        coincidence, I know him through his relative in Guam,

18        his name is Yamamoto, so he was interesting in the

19        Saipan, so I talked to him that property also.  That's

20        already, oh 10 years ago.

21   Q    You mentioned a Kim?

22   A    Ah yes, this is Kim is, you know in Korea, Kim is so --

23        million Kims there, you know.

24        MR. CUSHNIE:  Right.

25   A    That one is we call -- I call JJ, JJ Kim.  He help me

-22-

1           the my hotel ah--

2      OFF/ON RECORD - Continued on Side B.

3      Q    Have you ever ah, posted signs on the property ah, like

4           for lease?  For rent?

5      A    No, I didn't.

6      Q    Lately the property has been ah, well, overgrown,

7           people have been throwing trash, garbage, ah other

8           things on the property, ah have you ever during the

9           past, say, 12 years or more, ah had the property

10          cleaned?

11          MR. PIERCE:  Well--

12     A    Yes, ah--

13          MR. PIERCE:  Excuse me.  You have to answer, but I want

14     to object first.  Objection; assumes facts not in evidence,

15     go ahead and answer the question.  Have you ever had the

16     property cleaned.

17     A    Yes, before.

18     Q    Okay, could you tell me when, sir?

19     A    Ah that time, still I'm operating the MTDC, I use my

20          employee to clean the property, even that ah -- ah not

21          to fence it, but to, how do you call?  The wire?  To

22          private property, to sign it.

23     Q    Okay, ah when was the last time you did this, sir?

24     A    I cannot ah, memorize.

25     Q    Well, when did MTDC stop operating, do you recall?

1    already.  So, 55 year lease?  I have it as on a ground

2    lease, I have a right to develop, but same time, if I

3    cannot develop it, I gonna share to somebody, which is

4    -- which is if somebody interesting in to reasonable

5    understandable price, I might re -- give up my

6    development.  That time, I gonna share to the

7    Mr. Guerrero, one third.  That's what my understanding.

8    Q    Okay, so your understanding is that you don't have any

9         obligation or duty to go out and find a lessee or

10        somebody to take an assignment of the lease?  That is,

11        you have no obligation to do so.  You can just sit on

12        the property for -- forever.

13   A    Because this Settlement Agreement I signed inside that

14        ah, judge's chamber.  You remember also.  Everybody

15        there, even my counselor there.  Then my counselor and

16        you guys talking to convince me to sign the paper,

17        that's why I signed it.  This is honest.

18   Q    Okay, but if I could ask the question again then, ah is

19        it your understanding that you have no duty or

20        obligation ah, to go out and actively market the

21        property, that is to...

22   A    I don't know.

23   Q    ....lease it--

24   A    I don't know.

25        MR. CUSHNIE:  You don't know.

-27-

1  A  I don't -- I don't have any income in here.

2  Q  Okay, but my question, sir, is that -- is that your

3     only means of support, the money that you get from your

4     friend in Japan?

5  A  Yeah, sometimes I borrow too.

6  Q  Okay, so you have income from your friend in Japan and

7     you borrow money from other people, is this correct?

8  A  Yeah, yeah, yeah.

9  Q  Okay, is there any other source of income?

10  A  No.

11  Q  Have the two properties in Garapran -- Garapan, during

12     the period of time that this lease has been in effect,

13     ah has -- have those properties ever earned any money?

14  A  No.

15     MR. CUSHNIE: ...[pause], okay, I have no further

16  questions of the witness, unless Mr. Pierce does.

17     MR. PIERCE:  No, sir.  Thank you very much.

18     MR. CUSHNIE:  Okay, well thank you, Mr. Isoda.

19  A  Thank you...[laughing].

20     MR. CUSHNIE:  I appreciate it.

21     MR. PIERCE: Those are the exhibits, you have to give

22  those to Mr. Cushnie.

23     MR. CUSHNIE: Yeah, this will be attached to the

24  deposition.  I'm sure that ah, your counsel has told you the

25  procedure as far as having a transcript back, it will be

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

PEDRO R. DELEON GUERRERO,  :  CIVIL ACTION NO.04-0033

      Plaintiff,  :

      vs.  :

MASAYUKI ISODA, aka  :
MIKE ISODA,  :

      Defendant.  :

_____

## DEPOSITION OF PEDRO R. DELEON GUERRERO

Taken at the
Law Office of Richard W. Pierce
2nd Floor Alexander Bldg., San Jose
Saipan, Northern Mariana Islands
June 20, 2005

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Transcribed by**:
Marianas Transcription Services
P.O. Box 500633
Saipan, MP 96950
Tel: (670) 288-5470

1   in May of 2004, you're telling me those conditions existed

2   as far back as 1993?

3  A  Gradually they become worst and worst and worst.

4  Q  Are you talking about the growing vegetation?

5  A  Everything.  Dumping of nu ah trash and ah people using the

6     place and you know, everything.

7  Q  That's the physical appearance?  That's the physical

8     appearance?

9  A  That is the actual appearance of the ah--

10 Q  Yes, the way it looks.

11 A  Yeah.

12 Q  All I'm saying is other than the change in the physical

13    appearance between 2004 and 1993 is the other conditions

14    exist?

15 A  The condition of the premise early on ah when Mike took

16    over it is, it is something that you can just go ahead and

17    use the place.  The place, you know doesn't look the way it

18    looks later on, okay.  So the -- the -- the condition of

19    the premise it was something that any -- any person can

20    just move in and spend just little money to -- to nu ah

21    improve it and use it as an office or even stay there as a

22    residential nu place.  It has a water tank, building water

23    tank, it has two -- one, a former two bedroom house and the

24    other one was built by the people that we lease it -- I --

25    I bought from, use it for a small restaurant like the soba

-14-

1    and noodles.  So it was well presentable, it's -- it's

2    clean and it can be used right away.  But you establish

3    that.  You establish that.  People take advantage and

4    people goes there and dump whatever they wanted to dump on

5    this site without any -- without any sign of do not

6    trespasses, private property, without any sign of this

7    property is for sale or for lease, contact this number,

8    nothing whatsoever.

9  Q    Now all I'm saying, again the question is, between 1993 and

10       2004 the only change, thing to change was the physical

11       appearance?

12 A    No.

13 Q    What else changed?

14 A    The -- the only -- the only thing that is changed is the --

15       is the physical appearance.  Can you -- can you tell me of

16       your -- so that I can understand it more better what you

17       mean by physical appearance?

18       MR. PIERCE:  The way it looks.

19 A    The way it looks?

20       MR. PIERCE:  Yes, sir.

21 A    The way it looks, yeah, it's ah -- those are the changes,

22       yes.

23 Q    Now, sir, you mention the soba res -- was there a soba

24       restaurant in 1993?

25 A    No.  Ah what I'm saying -- what I said is that there was

1  very beginning of the Lease Agreement, the settlement

2  agreement, you know resulting in the 55 years agreement

3  there was an agreed provision that Mr. Isoda will ah

4  following that Lease Agreement, the 55 years lease.  He

5  should either develop into an assign or sublease the

6  property whereby both him and I would be benefited and I

7  will be receiving my share of the property under that

8  agreement.  He hasn't done that from immediately following

9  the lease agreement.  There have never been in my nu many

10  visits to the site to see whether the area has been

11  developed.  Or has there any sign nu at the property

12  showing that the property is up for lease.  There is no

13  sign, there's no up for lease sign, there's nothing,

14  there's no development.  What you see there are trashes,

15  people dumping on it, encroachment, you name it, and then

16  neighbors' complains and so forth.  The place is

17  deteriorating, the value of the property instead of

18  maintaining as what we agreed that the value of the

19  property should be -- should be maintained and or, you

20  know, ah improve it.  But instead, from following the lease

21  agreement, the property nu diminished in terms of its value

22  because is damaged, the property is damaged.  And when I

23  say damaged, it's the appearance of the property ah nu and

24  how the property is being used by other people ah up till

25  very recently there is a commercial encroachment on the

1    place that was questionable and I was not even informed

2    about the encroachment. These are the things that I am

3    referring to ah that if you do not nu take care of that

4    within 90 days.

5        Ah I returned to the place ah only to find out that it

6    remains the same. There still no ah sign for lease, ah and

7    in my many visit to the place, the people that are doing a

8    business ah close by were asking, is that for lease? Why,

9    are you interested? Yes, I'm interested, ah all that

10   thing. So ah I'm very concerned about the economic

11   condition of that or the fitness, so in essence I'm -- I'm

12   making reference to the fact that what Mr. Isoda and I

13   agreed upon under the lease agreement, the nu -- were never

14   materialize. And he didn't go back within the 90 days or

15   even after the 90 days, he didn't go back to correct all

16   those things.

17 Q  I see, you're saying he didn't -- what he didn't do in the

18   60 days is he didn't clean it up and make it presentable,

19   he didn't put up for rent sign, and what else did he failed

20   to do within 60 days?

21 A  I think I make myself very clear that you know, he did not

22   nu ah go back to ah see that the economic, you know

23   situation of the area which include the -- the -- the ah --

24   the site, how the site looks and so on. Because you, you

25   know very well that, you know if -- if -- I mean if your

1  place, particularly when it is in a very high commercial

2  area and you find it to be a dumping site, the value of

3  that property will, you know, without any question goes

4  down.  So he did not go and -- and -- and -- and -- and

5  clean it.  For example, if he goes back and clean it, it

6  will improve the image and value of the property.  But he

7  never did that.  And you know, I am trying to protect my

8  investment in that property.  And my investment in that

9  property is what stipulated in the settlement agreement and

10  in the lease agreement.  So he didn't do that.

11  Q  So you think by failing to do these items that you listed

12  that means that he abandoned the property?

13  A  I think that yes he abandoned the property because he does

14  not show any interest at all ah to -- to see that the --

15  the -- the property is maintained the way it should have

16  been maintained from when he took over and that by now ah

17  from the time he took over with many people inquiring, I

18  believe there will be -- that property would have been

19  making money for him and I'll be receiving my share.  And

20  he never did that.

21  Q  Now, have you ever notify Mr. Isoda before the exhibit

22  which is Exhibit C, the letter of May 2004, Exhibit C is

23  the complaint, have you ever notified him prior to the time

24  that he had abandoned the property?

25  A  Well, I feel that the -- that Mr. Isoda is um -- is a